IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JTH TAX LLC d/b/a LIBERTY TAX SERVICE,<br><br>           Plaintiff,<br><br>      vs.<br><br>OWEN H. D'SOUZA, NORMA C. D'SOUZA, and PICASSO TRIGGER COMPANY LLC,<br><br>           Defendants. | CIVIL NO. 20-00087 JAO-KJM<br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court conducted a bench trial by video teleconference in this matter on June 28 to 29, 2021.  Mia D. Obciana, Esq. appeared on behalf of Plaintiff JTH Tax LLC d/b/a Liberty Tax Service ("Plaintiff" or "Liberty").  Michael J. Collins, Esq. appeared on behalf of Defendants Owen H. D'Souza ("Owen"), Norma C. D'Souza ("Norma"), and Picasso Trigger Company LLC ("PTC") (collectively, "Defendants").  The Court has considered all the evidence presented, observed the demeanor of witnesses and evaluated their credibility and candor, and considered the arguments of counsel and the applicable law.  Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following Findings of Fact and Conclusions of Law, and CONCLUDES, for the reasons articulated below, that

Plaintiff is entitled to $267,258.96 in damages against Defendants, jointly and severally, and $67,288.11 in damages against Owen and Norma, jointly and severally.  Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

## FINDINGS OF FACT

### I.     PARTIES

1.     Plaintiff operates a system of tax preparation offices administered by various franchisees.  Ex. P-1 (2011 Franchise Agreement) at 3.

2.     Plaintiff's core businesses are the preparation of tax returns and electronic filing.  Ashcraft 6/28 at 30:1–3.

3.     PTC was formed in December 2011, though Owen did business under PTC's name prior to its formation and his initial discussions with Plaintiff.  Owen 6/28 at 148:13–25.

4.     Owen and Norma are members of PTC.  Ex. P-3 (Assignment and Amendment to Franchise Agreements) at 2.

5.     PTC provides business formation services and prepares tax returns. Norma 6/28 at 140:12–141:7.

6.     PTC offered tax preparation services to the public between July 2011 and the present.  Owen 6/28 at 149:18–23.

7.    The Court heard testimony from Owen, Norma, and Brian Ashcraft ("Ashcraft"), who is Plaintiff's Assistance Vice President of Product Development. Ashcraft 6/28 at 25:21–22.

8.    The Court found Ashcraft to be a credible witness based on its observation of his demeanor and the internal consistency of his testimony, though Ashcraft did not possess full knowledge of Plaintiff's database systems.

9.    The Court found Owen to be a generally, but not entirely, credible witness based on his demeanor and the fact that there were some, but not many, inconsistencies between his testimony and the other evidence and testimony adduced at trial.

10.    The Court found Norma to be a generally, but not entirely, credible witness based on her demeanor and the fact that there were some, but not many, inconsistencies between her testimony and the other evidence and testimony adduced at trial.

## II.    THE FRANCHISE AGREEMENTS

11.    Owen and Norma, individually as joint tenants, entered into two separate franchise agreements with Plaintiff regarding the operation of two Liberty Tax Service franchises:  a Franchise Agreement dated July 7, 2011 covering territory in and around Kihei on the island of Maui, State of Hawai'i ("2011 Franchise Agreement"); and a Franchise Agreement dated April 18, 2014 covering

3

territory in and around Lahaina on the island of Maui, State of Hawai'i ("2014 Franchise Agreement").  Exs. P-1 (2011 Franchise Agreement); P-2 (2014 Franchise Agreement).

12.     When Plaintiff encounters a potential franchisee with an existing business, the existing business undergoes a review process in which Plaintiff determines if the business is ancillary or if it competes with Plaintiff's business interests.  Ashcraft 6/28 at 27:18–28:12.

13.     When deciding if a potential franchisee's business is a competing business, Plaintiff considers whether it engages in tax preparation and electronic filing, which are Plaintiff's core businesses.  Ashcraft 6/28 at 29:22–30:3.

14.     If a franchisee has a competing existing business, the only two options are for the franchisee to cease the competing business or "grandfather" the business and integrate the business into Plaintiff's system.  Ashcraft 6/28 at 28:13–29:2.

15.     If the existing business is "grandfathered" into Plaintiff's system, the franchisee could migrate its existing customers into Plaintiff's system and pay a one-time fee in lieu of any royalties from those customers.  Ashcraft 6/28 at 28:16–29:2.

16.     Plaintiff does not allow franchisees to operate competing businesses because doing so may confuse Plaintiff's customer base and/or dilute its trademarks and operating system.  Ashcraft 6/28 at 30:12–21.

17.     If a franchisee disclosed the existence of an ancillary business, special stipulations regarding that business would be contained in a Schedule C of the franchise agreement.  Ashcraft 6/28 at 35:2–9, 18–21.

18.     Neither the 2011 Franchise Agreement nor the 2014 Franchise Agreement contained a Schedule C or any special stipulations regarding an existing business.  Exs. P-1 (2011 Franchise Agreement); P-2 (2014 Franchise Agreement).

19.     The Court does not find credible either Norma's testimony that she and Owen disclosed PTC's existence as their separate business to Plaintiff before starting a Liberty franchise or Owen's testimony that he disclosed his involvement with PTC to Plaintiff's recruiter based on (1) Ashcraft's testimony that if a franchisee disclosed an existing business, a stipulation regarding that business would appear in a Schedule C of the franchise agreement; and (2) Owen's omission of his involvement with PTC or any tax preparation business on his Request for Consideration that he submitted to Plaintiff, though Owen had disclosed that he had experience preparing personal taxes.  Norma 6/28 at 118:15–

18; Owen 6/28 at 185:4–19, 187:14–15; Ashcraft 6/28 at 35:2–9, 18–21; Ex. D-5 (Request for Consideration).

**A.    The 2011 Franchise Agreement**

20.    In or around January 2011, Owen and Plaintiff engaged in discussions regarding operating a franchise location on the island of Maui.  Owen 6/28 at 148:4–8; Ex. D-4 (1/5/2011 Email).

21.    Owen consulted with a retired attorney regarding the 2011 Franchise Agreement and understood his obligations thereunder.  Owen 6/28 at 150:9–22.

22.    Owen submitted a Request for Consideration to Plaintiff that functioned as his application to become a franchisee, on which he answered in the affirmative to the question whether he had ever been self-employed; listed three current jobs at Wal-Mart, Fearless Inc. – Mama's Fish House, and University of Phoenix; and wrote "Personal Tax Preparation using Do-it yourself books to electronic software 1986 to present" in response to "Nature of tax experience if any."  Owen 6/28 at 186:20–187:22; Ex. D-5 (Request for Consideration).

23.    The first franchise location Owen and Norma opened pursuant to the 2011 Franchise Agreement (the "Kihei Franchise") was initially located at 1279 South Kihei Road and then was moved to 1367 South Kihei Road.  Norma 6/28 at 132:24–133:5; Owen 6/28 at 165:8–13.

**B.     The 2014 Franchise Agreement**

24.     Owen and Norma pursued a second franchise with Plaintiff in 2014 because they wanted to offer their services to the other side of the island of Maui and because they had just had a very successful year.  Norma 6/28 at 120:20–24.

25.     The second franchise location Owen and Norma opened pursuant to the 2014 Franchise Agreement (the "Lahaina Franchise") was located at 270 Lahainaluna Road.  Norma 6/28 at 132:13–18.

**C.     The Agreements' Terms**

26.     Section 4(c) of both the 2011 Franchise Agreement and the 2014 Franchise Agreement provided for the payment of reverse royalties from Plaintiff to Owen and Norma whereby Plaintiff would pay or credit Owen and Norma with fourteen percent (14%) of the tax preparation fees Plaintiff received from individuals located in the respective franchise territories.  Exs. P-1 (2011 Franchise Agreement) at 4; P-2 (2014 Franchise Agreement) at 3.

27.     Pursuant to Sections 4(d) through (f) of the 2011 Franchise Agreement and Sections 4(d), 4(f), and 4(g) of the 2014 Franchise Agreement, Owen and Norma agreed to pay royalties and an advertising fee based on a percentage of monthly gross receipts.  These royalty and advertising fee payments were due on the fifth of each month.  Exs. P-1 (2011 Franchise Agreement) at 4–5; P-2 (2014 Franchise Agreement) at 3–4.

7

28.     Under Section 4(d)(i) of the 2011 Franchise Agreement and Section 4(d) of the 2014 Franchise Agreement, the minimum royalties per franchise are $5000.00 for the first year, $8000.00 for the second year, and $11,000.00 for the third year and each year subsequent.  Exs. P-1 (2011 Franchise Agreement) at 5; P-2 (2014 Franchise Agreement) at 3.

29.     Any royalties or advertising fees that are more than fifteen days past due are subject to an eighteen percent interest rate under the 2011 Franchise Agreement and a twelve percent interest rate under the 2014 Franchise Agreement, both compounded daily.  Exs. P-1 (2011 Franchise Agreement) at 5; P-2 (2014 Franchise Agreement) at 4.

30.     Pursuant to Section 5 of the 2011 Franchise Agreement and the 2014 Franchise Agreement, Liberty was obligated to provide:  (1) a five-day Effective Operations Training; (2) one-day Hands On Training; (3) an operations manual; (4) assistance regarding site selection; (5) advertising and marketing; (6) tax preparation software; (7) tax preparation and technical support; (8) the ability to electronically file tax returns; (9) financial products; (10) operational support; (11) training updates; (12) assistance finding source suppliers; (12) leasing of equipment and other office supplies; (14) financing; (15) group discounts; and (16) assistance from an area developer ("AD").  Exs. P-1 (2011 Franchise Agreement) at 6–8; P-2 (2014 Franchise Agreement) at 5–7.

31.     Under Section 6(b)(i) of the 2011 Franchise Agreement, Owen and Norma agreed to "exclusively use the Liberty trade names, service marks and trademarks (collectively, the 'Marks')" in order "to hold out [their] Liberty Tax Service business to the public." Ex. P-1 (2011 Franchise Agreement) at 8.  Section 6(b)(i) of the 2014 Franchise Agreement contained a substantially similar provision, except that it only referenced "Liberty's Marks."  Ex. P-2 (2014 Franchise Agreement) at 7.

32.     Under Section 6(g) the 2011 Franchise Agreement, Owen and Norma "must use the software that [Plaintiff] provide[s]." Ex. P-1 (2011 Franchise Agreement) at 9.   Pursuant to Section 6(g) of the 2014 Franchise Agreement, Owen and Norma were required to use software provided by Liberty and were not allowed to "use, install or allow to be installed any other federal or state personal income tax return preparation or electronic filing software on any computers used in the [franchise]."  Ex. P-2 (2014 Franchise Agreement) at 8.

33.     Pursuant to Section 9 of the 2011 Franchise Agreement and the 2014 Franchise Agreement, Owen and Norma agreed that upon the expiration or termination of the franchise, they would immediately stop identifying themselves as Liberty, pay all amounts owed to Liberty, deliver all customer lists, return all files and records, and transfer all phone numbers associated with the franchise,

among other obligations.  Exs. P-1 (2011 Franchise Agreement) at 12; P-2 (2014 Franchise Agreement) at 13.

34.     Section 9 of the 2014 Franchise Agreement required that upon expiration or termination of the franchise, Owen and Norma "[a]ssign to Liberty (if Liberty elects), and upon lessor's consent, any interest that [Owen and Norma] have in any lease, sublease or any other agreement related to the [franchise]."  Ex. P-2 (2014 Franchise Agreement) at 13.

35.     Under Section 10(a) of the 2011 Franchise Agreement, Owen and Norma agreed that during the term of the agreement, they would "not . . . directly or indirectly, for a fee or charge, in the United States or Canada, prepare or electronically file income tax returns, or offer Bank Products, except in [their] capacity as a Liberty . . . franchisee using the Liberty . . . system to offer such products and services."  Ex. P-1 (2011 Franchise Agreement) at 13.  Section 10(a) of the 2014 Franchise Agreement contained an identical provision, except that it used the term "Financial Products" rather than "Bank Products."  Ex. P-2 (2014 Franchise Agreement) at 13.

36.     Under Section 10(b) of the 2011 Franchise Agreement, Owen and Norma agreed for a "period of two (2) years following the termination, expiration, transfer or other disposition of the [franchise] . . . not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns, or offer Bank

10

Products, within the [franchise] Territory or within twenty-five miles of the boundaries of the [franchise] Territory."  Ex. P-1 (2011 Franchise Agreement) at 13.  Section 10(a) of the 2014 Franchise Agreement contained identical language, except that it used the term "Financial Products" rather than "Bank Products."  Ex. P-2 (2014 Franchise Agreement) at 14.

37.    The 2011 Franchise Agreement included the following liquidated damages provision for breaches of Sections 10(a) and 10(b):

> In the event [Owen and Norma] fail to comply with either of the above covenants not to compete, [they] agree that a fair measure of [Plaintiff's] damages is the greater of (1) 130% of the Gross Receipts you have received by your actions in violation of the covenants not to compete or (2) 130% of the Gross Receipts the Liberty system has lost as a result of [Owen and Norma's] actions.  The parties further acknowledge that the full measure of damages is greater, and such a breach causes [Plaintiff] loss of customer goodwill and irreparable harm.

Ex. P-1 (2011 Franchise Agreement) at 13.

38.    The 2014 Franchise Agreement outlined a different liquidated damages provision for breaches of Sections 10(a) and 10(b):

> If [Owen and Norma] fail to comply with either of the above covenants not to compete, [Owen and Norma] agree to pay Liberty, as partial liquidated monetary damages, royalties and advertising fees as set forth in Section 4 of this Agreement against the greater of:  (1) the total Gross Receipts during [their] last fiscal year (May 1 – April 30) of operation for each Territory in which [they] are in breach; or (2) the total revenue [they] received in breach of a covenant not to compete.  The greater of these two dollar figures shall be multiplied by two (2) to give consideration to lost, repeat, and referral business to Liberty.  [They]

> acknowledge that any breach of the covenants not to compete causes damage to the integrity of Liberty's franchised system, loss of franchisee and customer goodwill and irreparable harm. [They] specifically acknowledge that the full measure of these damages is greater than that specified herein.

Ex. P-2 (2014 Franchise Agreement) at 14.

39.     Pursuant to Section 10(e) of the 2014 Franchise Agreement, Owen and Norma agreed they would "not lease, sub-lease, assign or guaranty a lease in the [franchise area] to or for a person or entity who will offer income tax preparation at such an office[,]" shall "use reasonable good faith efforts to help Liberty secure possession of the office locations through a lease assignment or otherwise," and "use reasonable, good faith efforts to ensure that, for a twenty-four (24) month period after non-renewal or termination of this Agreement, no person or entity will offer income tax preparation at the properties where [their] former Liberty offices were located."  Ex. P-2 (2014 Franchise Agreement) at 14.

40.     Section 10(e) of the 2011 Franchise Agreement and Section 10(f) of the 2014 Franchise Agreement required Owen and Norma "not to disparage Liberty or its current and former employees or directors" and further stated that "[d]uring the term of this Agreement, [they] also agree not to do any act harmful, prejudicial or injurious to Liberty."  Exs. P-1 (2011 Franchise Agreement) at 13; P-2 (2014 Franchise Agreement) at 14.

41.     Section 10(h) of both the 2011 Franchise Agreement and the 2014 Franchise Agreement indicated that Owen and Norma agree the provisions in Section 10 are "reasonable, valid and not contrary to the public interest."  Exs. P-1 (2011 Franchise Agreement) at 13; P-2 (2014 Franchise Agreement) at 15.

42.     Pursuant to Section 12(a) of the 2014 Franchise Agreement, Owen and Norma agreed that "[d]uring the term of this Agreement and following the expiration or termination of this Agreement, [Owen and Norma] covenant not to directly or indirectly communicate, divulge, or use any Confidential Information for [their] personal benefit or the benefit of any other person or legal entity except as specifically provided by the terms of this Agreement or permitted by Liberty in writing prior to disclosure."  Ex. P-2 (2014 Franchise Agreement) at 15–16.

43.     Under Section 15(a) of the 2011 Franchise Agreement, "Virginia law governs all claims which in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto."  Ex. P-1 (2011 Franchise Agreement) at 16. Section 17(a) of the 2014 Franchise Agreement contains a substantially similar provision.  Ex. P-2 (2014 Franchise Agreement) at 19.

44.     Pursuant to Section 19 of the 2011 Franchise Agreement and Section 21 of the 2014 Franchise Agreement, the parties acknowledged that the respective agreements were the "entire agreement[s]" between the parties and that those agreements "supersede[] all other prior oral and written agreements and

understandings between [Owen and Norma] and Liberty." Exs. P-1 (2011 Franchise Agreement) at 17; P-2 (2014 Franchise Agreement) at 20.

45.     Section 21 of the 2011 Franchise Agreement and Section 26 of the 2014 Franchise Agreement contain personal guaranties whereby Owen and Norma agreed to abide by the terms of the respective agreements, including making all payments. Exs. P-1 (2011 Franchise Agreement) at 17–18; P-2 (2014 Franchise Agreement) at 21.

46.     On December 18, 2014, the parties executed an Assignment and Amendment to Franchise Agreement in which Owen, Norma, and PTC replaced Owen and Norma as franchisee under both the 2011 Franchise Agreement and the 2014 Franchise Agreement. Owen, Norma, and PTC agreed that they "shall remain/become a guarantor of the [2011 and 2014] Franchise Agreements and shall be responsible for all obligations pursuant to the [2011 and 2014] Franchise Agreements." Ex. P-3 (Assignment and Amendment to Franchise Agreements) at 1.

47.     In Section 4 of the Assignment and Amendment to Franchise Agreements, Owen, Norma, and PTC agreed to "enter into a separate Guaranty Agreement whereby all accounts and notes receivable balances owed by Franchisee shall be guaranteed." The term "Franchisee" was not a defined term in the Assignment and Amendment to Franchise Agreements and the parties did not

14

introduce evidence of any separate Guaranty Agreement at trial.  Ex. P-3

(Assignment and Amendment to Franchise Agreements) at 1.

## III.   THE PROMISSORY NOTE

48.     On April 18, 2014, Owen and Norma provided Plaintiff with a

Promissory Note under which they agreed to pay a principal balance of $32,000

together with interest at a rate of twelve percent per annum, payable in interest-

only annual payments beginning on February 28, 2015, with the principal balance

and all remaining interest due on February 28, 2018.  Ex. P-4 (Promissory Note) at

1.

49.     The Promissory Note stated that in the event of default, which

includes failure to make a scheduled payment or breach of any other agreement

between the parties, Owen and Norma shall be responsible for "the entire unpaid

balance . . . and all accrued interest shall become immediately due and payable,"

and that Owen and Norma shall "pay all attorneys' fees and other costs and

expenses that Liberty may incur in connection with the collection or enforcement

of this Note."  Ex. P-4 (Promissory Note) at 1–2.

50.     The Promissory Note contained a choice of law provision that states it

"shall be construed in all respects and enforced according to the laws of the

Commonwealth of Virginia."  Ex. P-4 (Promissory Note) at 3.

## IV.   PERFORMANCE BY THE PARTIES

### A.   Training

51.    Owen admitted that Plaintiff provided him with both the five-day Effective Operations Training and the one-day Hands-On Training that Plaintiff was obligated to provide.  Owen 6/29 at 82:19–83:3.

52.    After executing the 2011 Franchise Agreement, Owen attended a five-day Effective Operations Training program Plaintiff hosted in Las Vegas, but Owen felt that Plaintiff did not provide adequate training in the use of its tax preparation software.  Owen 6/28 at 189:12–191:14; Owen 6/29 at 19:3–14.

### B.   Area Developers

53.    Plaintiff utilized the services of ADs, with whom Plaintiff contracted to provide development, business support, operational support, and marketing support to the franchisee in a given area.  Ashcraft 6/28 at 101:18–102:5.

54.    The AD does not have final authority to act on behalf of a franchisee or exercise direct supervisory authority over an independent franchisee; the franchisee makes decisions as an independently owned business, though there are certain decisions that require Plaintiff's approval under the governing franchise agreement.  Ashcraft 6/28 at 107:17–108:13; Ashcraft 6/29 at 119:25–120:4.

55.     Pursuant to instructions he received from Plaintiff's recruiter, Jeff Jones, Owen always reported to the AD and not to Plaintiff directly.  Owen 6/29 at 10:13–23.

56.     Defendants worked with four separate ADs during their time as a Liberty franchisee, including Geoff Knapp ("Knapp"), who was the AD from 2013 through 2019.  Owen 6/28 at 173:7–27.

57.     Knapp instructed Owen to violate county ordinances regarding signage and waving.  Owen 6/29 at 12:24–13:15.

58.     Owen did not actually meet with Knapp in person at any point.  Owen 6/29 at 21:20–25.

**C.    Tax Preparation Software**

59.     Plaintiff provided Defendants with proprietary tax preparation software, but Defendants had trouble utilizing the software to prepare Hawai'i state tax returns and business tax returns.  Owen 6/29 at 17:20–19:5.

60.     In 2018, Plaintiff switched to a different proprietary tax preparation software called Phoenix.  Ashcraft 6/29 at 132:14–18.

61.     Plaintiff provided Defendants with Drake software to prepare business state tax returns, but the business returns Owen prepared in 2012 and 2013 with this software were rejected by the state, so Owen later turned away potential

17

customers who needed to file state business tax returns.  Owen 6/29 at 20:17–21:11.

62.     Owen experienced various glitches and bugs with the software Plaintiff provided.  Owen 6/29 at 97:2–13.

63.     Between 2011 and 2019, there were approximately 15–20 other Liberty offices in the State of Hawaiʻi, and those offices were collectively able to prepare and electronically file at least 5000 Hawaiʻi state tax returns for many of those years using Plaintiff's tax preparation software, including business tax returns.  Ashcraft 6/28 at 44:12–45:8; Ashcraft 6/29 at 121:15–18.

64.     Owen used ProSeries tax preparation software to prepare business taxes during the term of the 2011 Franchise Agreement, which the AD orally approved.  Owen 6/28 at 159:12–160:2, 161:18–23.

**D.     The Success of the Kihei Franchise**

65.     In Owen and Norma's third year in business (2013), the Kihei Franchise was the top-ranked Liberty franchise in the State of Hawaiʻi and was ranked number 100 in the country.  Owen 6/28 at 198:15–24; Ex. P-10 (2011–15 Gross Receipts Report).

66.     In Owen and Norma's third year in business, the Kihei Franchise had completed over 700 tax returns, which was close to Plaintiff's goal of 1000 returns per office.  Owen 6/28 at 198:2–7.

18

E.    **Lucy Almeida**

67.    Owen and Norma had an employee named Lucy Almeida ("Almeida"), who worked for them from 2012 until November 2014 as the office manager at the Kihei Franchise.  Owen had hoped that Almeida would operate the Kihei Franchise office while he and Norma operated the Lahaina Franchise office.  Owen 6/28 at 167:13–168:6, 193:12–25.

68.    While Almeida was employed by Owen, Owen suspected that Almeida was filing fraudulent tax returns or forged documents, investigated those suspicions, believed those suspicions to be true, but still planned to place Almeida in charge of one of the franchise locations.  Owen 6/29 at 92:21–93:15.

69.    Owen concluded that Almeida falsified documents based on Owen's own investigation and files.  Owen 6/29 at 69:5–70:7.

70.    After resigning from her office manager position at the Kihei Franchise, Almeida worked at a different Liberty franchise before beginning employment with Plaintiff's corporate office in 2016.  Ashcraft 6/29 at 117:22–118:11.

71.    When Owen and Norma visited Plaintiff's Kahului office after signing the 2014 Franchise Agreement, they discovered that Almeida was working as the office manager in Plaintiff's Kahului office.  Owen 6/28 at 194:23–195:8.

19

72.     After Owen and Norma opened the Lahaina Franchise and Almeida resigned, Owen and Norma lost their supervisor, their staff, and a majority of their clients at the Kihei Franchise.  Almeida brought the entire office staff from the Kihei Franchise with her, aside from the "wavers," i.e., employees who stand in the street and wave.  Norma 6/28 at 120:25–121:6; Owen 6/28 at 194:3–9.

73.     Owen believes that Almeida had copied Owen and Norma's client lists, data sheets, and confidential information, which Owen described as a data breach, but Owen did not actually witness Almeida copying or possessing any of their materials.  Owen 6/28 at 199:13–15; 202:25–203:23.

74.     Defendants lost a substantial number of clients at the Kihei Franchise the tax season immediately after Almeida's resignation.  Owen 6/28 at 196:22–197:5.

75.     After Almeida's resignation, Owen received complaints from customers who believed that Defendants were no longer open for business.  Owen 6/29 at 28:18–22.

76.     Defendants incurred a drop in business that interfered with their ability to pay royalties, advertising fees, and make payments on the Promissory Note beginning in the year 2015.  Owen 6/28 at 197:22–198:11.

77.     Plaintiff has an oversight process whereby it places a tax preparer on its "blacklist" after receiving a complaint about that tax preparer while it investigates the complaint.  Ashcraft 6/29 at 112:18–113:22.

78.     On March 14, 2015, Owen contacted Plaintiff through its internal messaging system and accused a former employee of stealing his customer list and using that list to solicit clients.  Owen also accused that tax preparer of manipulating tax returns in order to increase the refund amounts.  On March 17, 2015, Plaintiff's employee requested information regarding Owen's complaint, which Owen then provided, identifying Almeida as the tax preparer in question. On March 19, 2015, Plaintiff's employee informed Owen that Plaintiff is investigating the complaint and is working with Internal Audit to review it.  Ex. D-11 (Chat Log 047–055) at 051–053.

79.     On December 14, 2015, Owen contacted Plaintiff through Plaintiff's internal messaging system and requested that Almeida be placed on Plaintiff's blacklist.  The next day, Plaintiff's employee confirmed that Almeida had been placed on the blacklist and suggested that Owen offer his customers the option to file amended returns to avoid an audit, and further suggested that Owen discuss with his attorney the possibility of issuing a data breach notice as a result of his statement that confidential information may have been compromised.  Ex. D-12 (Chat Log 056–064) at 056–057.

21

80.     As a result of Owen's complaint against Almeida to Plaintiff through Plaintiff's internal messaging system, Almeida was indeed placed on Plaintiff's blacklist.  Owen 6/29 at 66:2–14; Ashcraft 6/29 at 114:14–22.

81.     In January 2016, Owen continued to communicate with Plaintiff's employee through Plaintiff's internal messaging system.  After Owen informed her that he would be filing a complaint against Almeida with the Maui Police Department, Plaintiff's employee requested a copy of the police report and a summary of Owen's allegations, which requests Owen obliged.  Ex. D-12 (Chat Log 056–064) at 058–062.

82.     Ashcraft and his team investigated Owen's allegations that Almeida stole customer information and did not find any evidence that corroborated Owen's allegations against Almeida.  Ashcraft 6/29 at 115:1–13.

83.     Ashcraft and his team surmised that various customers had followed Almeida from the Kihei Franchise to her new Liberty location because Almeida had a "loyal following[]" and was popular among Liberty's customers, in part because she was born and raised on Maui.  Ashcraft 6/29 at 115:14–116:12.

84.     On January 30, 2016, Owen contacted Plaintiff through its internal messaging system and asked why Almeida had been removed from the blacklist and who had authorized that decision.  Two days later, Plaintiff's employee

responded, "Your AD will be in contact with you."  Ex. D-12 (Chat Log 056–064) at 062.

85.     Plaintiff removed Almeida from its blacklist based on a review of certain tax returns she prepared, a background check on Almeida through ADP, another franchisee's previous vetting of Almeida, and Ashcraft's team's investigation into Owen's complaint.  Ashcraft 6/29 at 116:20–117:21.

86.     Ashcraft's team contacted the AD for information as part of its investigation, but the AD was not involved in the decision to remove Almeida from Plaintiff's blacklist.  Ashcraft 6/29 at 119:9–24.

87.     Owen is not aware of any arrests, prosecutions, or court cases relating to any of his accusations of data theft, which accusations he first made in 2015. However, Owen believes that an arrest had been attempted, though he provided no details regarding the attempted arrest.  Owen 6/28 at 171:5–17.

**F.     The Violation of the Agreements**

88.     Owen filed between 25 and 50 business tax returns as PTC rather than a Liberty franchisee in the 2015 tax year.  Owen 6/29 at 87:13–22.

89.     Owen admitted that he filed tax returns in the 2016 tax year outside of his capacity as a Liberty franchisee.  Owen 6/29 at 87:24–88:2.

90.     Owen admitted that in the 2017 tax year, a total of 159 tax returns were filed using his Electronic Filing Identification Number ("EFIN"), including

tax returns filed by PTC and by Owen's colleague that uses his EFIN.  Owen 6/29 at 88:9–17.

91.     Owen filed tax returns as PTC outside his capacity as a Liberty franchisee in the tax years 2018, 2019, and 2020, including approximately 400 tax returns in the 2019 tax year.  Owen 6/29 at 88:18–89:17; Ashcraft 6/29 at 108:17–21.

92.     PTC's EFIN was used to file at least 1500 tax returns outside of PTC's capacity as a Liberty franchisee between 2015 and 2020.  Ashcraft 6/29 at 108:2–9.

93.     The average cost of completing a tax return was approximately $220.00 in 2015 and $250.00 in 2020.  Ashcraft 6/29 at 108:10–16.

94.     Neither Owen nor Norma was aware of any notice to cure that Defendants received between 2012 and 2018 regarding any breach of either the 2011 Franchise Agreement or the 2014 Franchise Agreement.  Norma 6/28 at 118:21–119:10; Owen 6/29 at 17:15–19.

95.     Plaintiff neither knew or should have known that PTC conducted its own business operations outside of being a Liberty franchisee as it is common for franchisees to be organized as limited liability companies, partnerships, or corporations.  Ashcraft 104:15–105:10.

## V.    TERMINATION

96.    Owen described the Lahaina Franchise's first year as "dismal."  Owen 6/29 at 41:14–15.

97.    Defendants incurred a substantial loss of revenue after 2014.  Norma 6/28 at 125:16–126:1; Owen 6/29 at 41:25–42:2.

98.    As a result of Defendants' difficulty in maintaining their financial obligations under the 2011 Franchise Agreement and the 2014 Franchise Agreement, Owen informed the AD that Defendants may have to cease operations. Owen 6/29 at 42:14–16.

99.    The 2011 Franchise Agreement terminated on July 7, 2016.  Ex. P-1 (2011 Franchise Agreement) at 3, 19.

100.    Owen engaged in discussions with the AD regarding a potential sale of the Kihei Franchise to either the AD or Plaintiff, but no sale actually occurred. Owen 6/29 at 42:21–44:20.

101.    Owen believes that if he had been able to sell the Kihei Franchise, he would have been able to pay all of Defendants' financial obligations to Plaintiff, and that a surplus would remain.  Owen 6/28 at 44:15–24.

102.    The franchisor-franchisee relationship between Plaintiff and Defendants terminated on April 19, 2019 when the 2014 Franchise Agreement terminated.  Owen 6/29 at 99:11.

25

103.   Owen attributed Defendants' inability to remain current with its financial obligations to the decline in business that Defendants suffered after opening the Lahaina Franchise and incurring a subsequent decline in customers. Owen 6/29 at 24:19–28:3.

## VI.   PAYMENTS AND BALANCES

### A.   The Fee Intercept Process

104.   Plaintiff received certain payments from Defendants through a fee intercept process in which any fees obtained through one of Plaintiff's bank products would be transmitted to Plaintiff rather than the franchisee if the franchisee had outstanding debts to Plaintiff, but the fee intercept process would not be used for franchisees to pay current royalties or advertising fees owing, only past due amounts.  Ashcraft 6/28 at 100:9–16; Ashcraft 6/29 at 102:24–103:15; Norma 6/28 at 142:23–143:1; Owen 6/29 at 23:24–24:7; Ex. P-9 (Debt Balances as of 9/18/2019).

### B.   Owen and Norma's Payments

105.   Norma's role in running the Liberty franchises was mainly administrative, though Norma also prepared tax returns.  Norma was not involved in making payments pursuant to the 2011 Franchise Agreement or the 2014 Franchise Agreement or the franchises' finances generally.  Norma 6/28 at 115:2–6, 115:21–116:4.

26

106.   Owen also made certain payments in satisfaction of amounts Defendants owed Plaintiff through credit card or ACH payments through Plaintiff's web portal.  Owen 6/29 at 24:10–14.

107.   Owen admitted that he did not pay the full amount due under the 2011 Franchise Agreement, the 2014 Franchise Agreement, or the Promissory Note, and believes Defendants owe Plaintiff approximately $100,000.00, which is based on his recollection of the amount owed in April 2019.  Owen 6/28 at 152:21–153:5, 176:16–177:2; Owen 6/29 at 73:5–14.

108.   Norma could not recall if any payments were made pursuant to the Promissory Note.  Norma 6/28 at 142:13–16.

109.   Owen did not make any payments in satisfaction of the amounts owing under the Promissory Note, but is unsure if Plaintiff applied any funds Plaintiff obtained from Defendants through Plaintiff's fee intercept program to the amounts owing under the Promissory Note.  Owen 6/28 at 158:13–159:7.

**C.     Debts**

110.   Plaintiff introduced a document depicting the total debts owed by PTC, Owen, and Norma to Plaintiff as of September 18, 2019 ("Debt Balances as of 9/18/2019").  Ex. P-9 (Debt Balances as of 9/18/2019); Ashcraft 6/28 at 59:24–60:8.

111.   Plaintiff used Great Plains accounting software to maintain the records reflected in the Debt Balances as of 9/18/2019.  Ashcraft 6/28 at 98:1–5.

112.   The Debt Balances as of 9/18/2019 shows a total amount owing as of September 18, 2019 of $221,621.52, which includes accounts receivable of $168,346.41 and notes receivable of $54,942.30.  Ex. P-9 (Debt Balances as of 9/18/2019) at LIBTAX000024.

113.   The notes receivable on the Debt Balances as of 9/18/2019 reflect the existence of two separate loans:  one with an unpaid principal balance of $32,000.00, and a second with an unpaid principal balance of $2,024.64.  Ex. P-9 (Debt Balances as of 9/18/2019) at LIBTAX000024.

114.   The loan on the Debt Balances as of 9/18/2019 with an unpaid principal balance of $32,000.00 refers to the loan documented by the Promissory Note.  Exs. P-4 (Promissory Note); P-9 (Debt Balances as of 9/18/2019) at LIBTAX000024.

115.   No evidence was presented at trial regarding a loan Plaintiff made to Defendants with an unpaid principal balance of $2,024.64.

116.   Owen agreed that Defendants owed the notes receivable balance reflected on the Debt Balances as of 9/18/2019, but believed the accounts receivable should only have been approximately $44,000.00 plus interest.  Owen 6/29 at 76:9–77:21.

28

117.   The Debt Balances as of 9/18/2019 also itemizes each of the amounts billed to Defendants and the amounts Plaintiff received from Defendants.  Ex. P-9 (Debt Balances as of 9/18/2019); Ashcraft 6/28 at 60:22–61:6.

118.   The positive numbers (numbers without parentheses) on the Debt Balances as of 9/18/2019 reflect amounts billed to Defendants, and the negative numbers (numbers with parentheses) reflect payments Defendants made.  Ex. P-9 (Debt Balances as of 9/18/2019); Ashcraft 6/28 at 66:2–13.

119.   The balance owed as of the date of trial would be higher than the amount reflected on the Debt Balances as of 9/18/2019 because interest continued to accrue.  Ashcraft 6/28 at 60:16–20.

120.   The Debt Balances as of 9/18/2019 included various finance charges, which Ashcraft believed were charges for the interest on any past due amounts, though Ashcraft was not sure of the difference between how finance charges and interest charges were coded and that he was not completely sure what the finance charges were.  The Debt Balances as of 9/18/2019 does not contain any charges that are designated as interest charges, and the Court therefore construes the finance charges on the Debt Balances as of 9/18/2019 to reflect interest owing on amounts due.  Ex. P-9 (Debt Balances as of 9/18/2019); Ashcraft 6/28 at 66:18–67:3, 100:25–101:1.

**D.    Gross Receipts**

121.   Plaintiff introduced a document that Ashcraft referred to as a Gross Receipts Report, which showed Defendants' gross receipts on a monthly and annual basis for the years 2011 through 2015, which were the basis for the calculation of royalties and advertising fees.  The gross receipts were equal to the payments received minus Send a Friend bonuses and refunds.  Ex. P-10 (2011–15 Gross Receipts Report); Ashcraft 6/28 at 61:16–65:2.

122.   Plaintiff introduced a second Gross Receipts Report, which Ashcraft stated is the same as Gross Receipts Report in Exhibit P-10, except that it covers the tax years 2014 through 2018.  Despite Ashcraft's testimony, it is apparent from the face of both Gross Receipts Reports that they do not simply cover different (but overlapping) years.  The two reports contain different Office ID numbers and correspond to the time periods in which the Kihei Franchise and Lahaina Franchise were each in operation, so the Court finds that the 2011–15 Gross Receipts Report pertained to the Kihei Franchise and that the 2014–18 Gross Receipts Report pertained to the Lahaina Franchise.  Exs. P-10 (2011–15 Gross Receipts Report); P-11 (2014–18 Gross Receipts Report); Ashcraft 6/28 at 69:11–19.

## VII.   DEFENDANTS' POST-TERMINATION CONDUCT

123.   No evidence was adduced at trial relating to Defendants' use of Plaintiff's trade names, service marks, and trademarks (collectively, "Liberty's Marks") during or after the respective terms of the 2011 Franchise Agreement and the 2014 Franchise Agreement.

124.   No evidence was adduced at trial relating to any misuse on Defendants' part of Plaintiff's Confidential Information, as referenced in Section 12 of the 2014 Franchise Agreement.

125.   Owen met with PTC's clients at the Lahaina Franchise Office from 2015 to the present; did not meet with PTC's clients at the Kihei Franchise office at 1279 South Kihei Road; and only had minimal meetings with PTC's clients at the Kihei Franchise office at 1367 South Kihei Road.  Owen 6/28 at 175:11–25.

126.   In addition to using PTC's EFIN to file tax returns as a Liberty franchisee, Owen also used PTC's EFIN to file tax returns for PTC's clients and allowed a colleague of his to file tax returns with that same EFIN.  Owen 6/29 at 88:2–8.

127.   Norma testified that upon the termination of the 2011 Franchise Agreement, Defendants vacated the office space located at 1367 South Kihei Road and engaged in efforts to sell the franchise to Geoff Knap, who was then the AD, but did not try to assign the lease to Plaintiff.  Norma 6/28 at 133:7–135:4.

31

128.   Owen testified that he assigned the lease for the office spaces located at 1279 South Kihei Road and 1367 South Kihei Road to Plaintiff upon the termination of the 2011 Franchise Agreement.  Owen 6/28 at 168:20–169:2.

129.   Owen considered his efforts to sell the Kihei Franchise to the AD or Plaintiff a satisfaction of his obligations to assign the lease for the Kihei Franchise to Plaintiff.  Owen 6/29 at 44:10–13.

130.   Upon the termination of the 2014 Franchise Agreement, Norma did not engage in any efforts to assign the lease for the Lahaina Franchise to Plaintiff.  Norma 6/28 at 135:22–136:1.

131.   Owen tried to assign the lease for the Lahaina Franchise to Plaintiff, but the landlord, Maui County Federal Credit Union ("MCFCU"), did not want Plaintiff to be its tenant because Owen informed MCFCU that it had had problems with Plaintiff, including a data breach.  MCFCU therefore did not consent to the assignment of lease and Owen remains the lessee for the office space at 270 Lahainaluna Road.  Owen 6/28 at 168:24–170:17.

132.   In addition to operating out of its primary office, PTC operated out of 270 Lahainaluna Road, *i.e.*, the former address for the Lahaina Franchise, from November 2019 to the present.  Owen 6/28 at 162:17–163:12.

133.   After Defendants ceased operating Liberty franchises, Owen and Norma removed the Liberty signs, turned in signs and trade fixtures, ceased

32

identifying themselves as a Liberty franchise, ceased running Liberty

advertisements, ceased using Liberty marks, and destroyed posters and letterhead.

Norma 6/28 at 128:7–18, 130:1–13; Owen 6/29 at 99:11–21; Ex. D-2 (Delivery

Receipt).

134.   After the 2014 Franchise Agreement terminated, Owen contacted the

AD, who was then Thomas Bartolomeo ("Bartolomeo"), and requested instructions

on how to return Plaintiff's property, but Owen did not receive a response from

Bartolomeo or any other representative from Plaintiff.  Owen 6/29 at 37:16–25.

135.   On September 29, 2019, Owen sought guidance via email from

Bartolomeo regarding the return of tax records and Plaintiff's operations manual

and guidance regarding how to respond to customers seeking assistance, but

neither Bartolomeo nor any other Liberty representative responded.  Owen 6/29 at

51:8–25; Ex. D-8 (9/24 Email).

136.   On September 26, 2019, Owen emailed Patricia Old, who is employed

by Plaintiff, in order to ascertain whether Bartolomeo was still the AD or if there

was someone else he should contact.  Owen 6/29 at 55:22–1; Ex. D-9 (9/26 Email).

137.   In 2020, Owen partnered with another tax preparer, and when that tax

preparer died, Owen prepared tax returns for his clients until a replacement was

found.  Owen 6/29 at 88:21–89:17.

138.   On July 17, 2020, Owen delivered tax files from the years 2011 through 2018, one Liberty costume, and three Liberty costume sashes to Plaintiff, which delivery is documented in a delivery receipt Owen prepared.  Owen 6/29 at 37:1–39:13; Ashcraft 6/29 at 111:13–24; Ex. D-2 (Delivery Receipt).

139.   Defendants returned Plaintiff's corporate manual to Plaintiff by mailing it to Plaintiff's counsel, who received it on July 23, 2020.  Owen 6/29 at 36:4–15; Ex. D-1 (USPS certified mail return receipt).

140.   Owen maintained the telephone number (808) 662-3829 for PTC, but also used that number unwittingly from time to time to conduct business for the Lahaina Franchise.  Norma 6/28 at 130:1–7; Owen 6/28 at 164:7–23, 166:3–9, 166:17–167:10.

141.   Owen did not assign either the (808) 874-4829 telephone number or the (808) 662-3829 telephone number to Plaintiff after the respective franchise agreements terminated.  Owen 6/28 at 168:13–17.

142.   The Court does not find credible Owen's testimony that Owen "handed over" the (808) 874-4829 and (808) 662-3829 telephone numbers to Plaintiff after the Kihei Franchise and Lahaina Franchise, respectively, terminated because of his previous testimony that he continues to use both phone numbers to conduct PTC business.  Owen 6/28 at 164:7–23; Owen 6/29 at 22:25–23:16.

## CONCLUSIONS OF LAW

34

1.      The Court has jurisdiction over the instant action under 28 U.S.C. §§ 1331 and 1367.

2.      Venue is proper in the District of Hawaii under 28 U.S.C. § 1391.

3.      Virginia law governs Plaintiff's claims arising out of the 2011 Franchise Agreement, the 2014 Franchise Agreement, and the Promissory Note. *See Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009) ("In a federal question action that involves supplemental jurisdiction over state law claims, we apply the choice of law rules of the forum state[.]" (citations omitted)); *Airgo, Inc. v. Horizon Cargo Transp., Inc.*, 66 Haw. 590, 595, 670 P.2d 1277, 1281 (1983) ("When the parties choose the law of a particular state to govern their contractual relationship and the chosen law has some nexus with the parties or the contract, that law will generally be applied." (citation omitted)).

## I.      COUNT I:  BREACH OF THE FRANCHISE AGREEMENTS (EQUITABLE CLAIM)

4.      "'The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'"  *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (quoting *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (2006)) (some internal quotation marks omitted and brackets omitted).

5.      "'[T]o secure an injunction, a party must show irreparable harm and the lack of an adequate remedy at law.'" *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 686 (Va. 2012) (quoting *Black & White Cars, Inc. v. Groome Transp., Inc.*, 442 S.E.2d 391, 395 (1994)).

6.      The 2011 Franchise Agreement, as amended by the Assignment and Amendment to Franchise Agreements, is a valid and enforceable contract between Plaintiff and Defendants.

7.      The 2014 Franchise Agreement, as amended by the Assignment and Amendment to Franchise Agreements, is a valid and enforceable contract between Plaintiff and Defendants.

8.      Defendants violated Section 6(g) of the 2011 Franchise Agreement and the 2014 Franchise Agreement by using software other than Liberty software to prepare tax returns.

9.      Plaintiff is not entitled to an injunction enforcing Section 6(g) of the 2011 Franchise Agreement and Section 6(g) of the 2014 Franchise Agreement because the covenants contained therein expired upon the termination of the respective franchise agreements.

10.      Defendants violated Section 10(a) of the 2014 Franchise Agreement by preparing tax returns for a fee during the term of the 2014 Franchise Agreement.

36

11.     Plaintiff is not entitled to an injunction enforcing the In-Term Covenant Not to Compete in Section 10(a) of the 2014 Franchise Agreement because that covenant expired upon the expiration of the 2014 Franchise Agreement.

12.     Defendants violated Section 10(b) of the 2011 Franchise Agreement by preparing tax returns for a fee within two years of the expiration of the 2011 Franchise Agreement.

13.     Plaintiff is not entitled to an injunction enforcing the Post-Term Covenant Not to Compete in Section 10(b) of the 2011 Franchise Agreement because the two-year covenant therein expired on July 7, 2019.

14.     Defendants violated Section 10(b) of the 2014 Franchise Agreement by preparing tax returns for a fee within two years of the expiration of the 2014 Franchise Agreement.

15.     Plaintiff is not entitled to an injunction enforcing the Post-Term Covenant Not to Compete in Section 10(b) of the 2014 Franchise Agreement because the two-year covenant therein expired on April 19, 2021.

16.     Plaintiff has not proven that Defendants used Plaintiff's Confidential Information, as referenced in Section 12 of the 2014 Franchise Agreement, without Plaintiff's consent or authorization.

37

17.     Because Plaintiff has failed to establish that Defendants breached the provision of Section 12 of the 2014 Franchise Agreement relating to Defendants' use of Confidential Information, Plaintiff is not entitled to injunctive relief regarding any use by Defendants of Plaintiff's confidential information.

18.     Defendants are entitled to judgment on Count I of the Complaint.

## II.     COUNT II:  BREACH OF THE FRANCHISE AGREEMENTS (MONETARY CLAIM)

19.     The 2011 Franchise Agreement, as amended by the Assignment and Amendment to Franchise Agreements, is a valid and enforceable contract between Plaintiff and Defendants.

20.     The 2014 Franchise Agreement, as amended by the Assignment and Amendment to Franchise Agreements, is a valid and enforceable contract between Plaintiff and Defendants.

21.     Defendants used software other than Plaintiff's software to prepare tax returns for Liberty customers, specifically to file business tax returns, in violation of Section 6(g) of both the 2011 Franchise Agreement and the 2014 Franchise Agreement.

22.     Plaintiff failed to prove that it suffered any injury or damage as a result of Defendants' use of software other than Liberty software.

23.     When a plaintiff establishes that a defendant breached a contract, but fails to establish damages with "reasonable certainty," the plaintiff may recover

nominal damages, but "no actual damages can be recovered." *Crist v. Metro.*

*Mortg. Fund, Inc.*, 343 S.E.2d 308, 311 (Va. 1986) (citations omitted); *see also*

*Orebaugh v. Antonious*, 58 S.E.2d 873, 875 (Va. 1950) ("While it is true upon the

breach of a valid and binding contract the law infers nominal damages, it does not

infer or presume substantial or compensatory damages.").

24.     Plaintiff is entitled to judgment on Count II of the Complaint against

Defendants and an award of nominal damages in the amount of Ten and 00/100

Dollars ($10.00).

## III.   COUNT III:  BREACH OF THE FRANCHISE AGREEMENT (ACCOUNTS RECEIVABLE & PROMISSORY NOTE)

25.     The 2011 Franchise Agreement, as amended by the Assignment and

Amendment to Franchise Agreements, is a valid and enforceable contract between

Plaintiff and Defendants.

26.     The 2014 Franchise Agreement, as amended by the Assignment and

Amendment to Franchise Agreements, is a valid and enforceable contract between

Plaintiff and Defendants.

27.     Defendants breached the 2011 Franchise Agreement by failing to pay

royalties, advertising fees, and interest due and owing thereunder.

28.     Plaintiff substantially performed all of its obligations under the 2011

Franchise Agreement; as such, Defendants' breach of contract was not excused.

39

29.     Defendants did not prove that Plaintiff or its agents caused Defendants' breach of the 2011 Franchise Agreement.

30.     Defendants breached the 2014 Franchise Agreement by failing to pay royalties, advertising fees, and interest due and owing thereunder.

31.     Plaintiff substantially performed all of its obligations under the 2014 Franchise Agreement; as such, Defendants' breach of contract was not excused.

32.     Defendants did not prove that Plaintiff or its agents caused Defendants' breach of the 2014 Franchise Agreement.

33.     Defendants owe Plaintiffs $200,674.16 under the 2011 Franchise Agreement and the 2014 Franchise Agreement, including interest.  The Court examined the Debt Balances as of 9/18/2019 (Ex. P-9) and found it to be an accurate assessment of the amounts owing under the 2011 Franchise Agreement and the 2014 Franchise Agreement, subject to the following limitations and calculations:

     a.  The Debt Balances as of 9/18/2019 contains a $5.23 charge on February 5, 2019 with a blank "Type" line.  There are also charges of $14.39 on February 5, 2019 marked EFF1019832; $194.21 on March 5, 2019 marked EFF1028995; $273.33 on April 5, 2019 marked EFF1036302; $25.00 on April 30, 2019 marked JTHFCP04196346; and $75.52 on May 5, 2019 marked EFF1043756.  There is no

40

evidence in the record linking these charges to any amounts due and

owing under either the 2011 Franchise Agreement or the 2014

Franchise Agreement.  Plaintiff therefore has failed to establish its

entitlement to these charges.  The Court therefore subtracts these

charges from the $168,346.41 balance shown on the Debt Balances as

of 9/18/2019.

b.  The following Finance Charges were assessed after February 5, 2019:

    i.  $1344.71 assessed on February 28, 2019;

    ii.  $1371.60 assessed on March 31, 2019;

    iii.  $1391.20 assessed on April 30, 2019;

    iv.  $1446.39 assessed on May 31, 2019;

    v.  $1537.37 assessed on June 30, 2019;

    vi.  $1552.74 assessed on July 31, 2019; and

    vii.  $1667.19 assessed on August 31, 2019.

Each of these Finance Charges presumably included some amount of

interest on charges that the Court struck in paragraph 33.a above from

the Debt Balances as of 9/18/2019.  The Court therefore strikes the

foregoing Finance Charges from the remaining balance on the Debt

Balances as of 9/18/2019 as Plaintiff is not entitled to interest on the

stricken charges, and there is no evidence in the record that enables

the Court to determine which portion of these Finance Charges may be attributed to the stricken charges.

c.  After making the foregoing deductions, the amount due under the 2011 Franchise Agreement and the 2014 Franchise Agreement as of September 18, 2019 is $157,447.53.

d.  There is no evidence in the record that allows the Court to determine the balances due under the 2011 Franchise Agreement and the 2014 Franchise Agreement separately because (1) the Debt Balances as of 9/18/2019 contained only one Finance Charge per month, rather than one Finance Charge per franchise agreement per month; and (2) the interest rate was eighteen percent (18%) per annum on the 2011 Franchise Agreement and twelve percent (12%) per annum on the 2014 Franchise Agreement.

e.  The Court therefore applied the lower interest rate of 12% per annum (compounded daily) in order to calculate interest due on the remaining amounts owing under the 2011 Franchise Agreement and the 2014 Franchise Agreement.

f.  The additional interest that accrued between September 18, 2019 and the date of these Findings of Fact and Conclusions of Law is $43,226.63.

34.    The Promissory Note is a valid and enforceable contract between Plaintiff and Owen and Norma.

35.    Owen and Norma breached the Promissory Note by failing to pay all of the principal and interest due and owing thereunder.

36.    Owen and Norma owe Plaintiff $67,288.11 under the Promissory Note, which is based on the following:

| Date Due | Description | Amount |
|---|---|---|
| February 28, 2015 | Interest through February 28, 2015 | $3370.67 |
| February 28, 2016 | Interest through February 28, 2016 | $3840.00 |
| February 28, 2017 | Interest through February 28, 2017 | $3840.00 |
| February 28, 2018 | Interest through February 28, 2018 | $3840.00 |
| February 28, 2018 | Principal | $32,000.00 |
| September 24, 2021 | Interest through September 24, 2021 | $20,397.44 |
| | Total | $67,288.11 |

37.    Plaintiff is therefore entitled to judgment on Count III of the Complaint and an award of damages of Two Hundred Thousand Six Hundred Eighty-Four and 16/100 Dollars ($200,684.16) against Defendants and Sixty-Seven Thousand Two Hundred Eighty-Eight and 11/100 Dollars ($67,288.11) against Owen and Norma.

## IV.   COUNT IV:  ACCOUNTS RECEIVABLE NOTE GUARANTY

38.    Plaintiff did not present evidence that Defendants entered into an Accounts and Notes Receivable Guaranty Agreement.

39.    Defendants are entitled to judgment on Count IV of the Complaint.

## V.   COUNT V:  BREACH OF THE FRANCHISE AGREEMENT § 10(A) (MONETARY CLAIM)

40.    The 2011 Franchise Agreement, as amended by the Assignment and Amendment to Franchise Agreements, is a valid and enforceable contract between Plaintiff and Defendants.

41.    Defendants violated Section 10(a) of the 2011 Franchise Agreement by preparing tax returns for a fee during the term of the 2011 Franchise Agreement.

42.    Defendants violated Section 10(b) of the 2011 Franchise Agreement by preparing tax returns for a fee within two (2) years of the expiration of the 2011 Franchise Agreement.

43.    Defendants violated Section 10(a) of the 2014 Franchise Agreement by preparing tax returns for a fee during the term of the 2014 Franchise Agreement.

44.    Defendants violated Section 10(b) of the 2014 Franchise Agreement by preparing tax returns for a fee within two (2) years of the expiration of the 2014 Franchise Agreement.

45.     Section 10(c) of each the 2011 Franchise Agreement and the 2014

Franchise Agreement contain varying liquidated damages provisions for breaches

of Sections 10(a) and 10(b) of the respective agreements.

46.     Under Virginia law,

> When the actual damages contemplated at the time of [an]
> agreement are uncertain and difficult to determine with exactness
> and when the amount fixed is not out of all proportion to the
> probable loss, the amount is deemed to have been intended as
> enforceable liquidated damages.  But where the damage resulting
> from a breach of contract is susceptible of definite measurement
> (as when the breach consists of failure to pay a sum of money)
> or where the stipulated amount would be grossly in excess of
> actual damages, courts of law usually construe such a stipulation
> as an unenforceable penalty.

*Taylor v. Sanders*, 353 S.E.2d 745, 746–47 (Va. 1987) (citing *Crawford v.*

*Heatwole*, 66 S.E. 46, 47–48 (1909)).  "[T]he construction of such stipulations

depends upon the intent of the parties as evidenced by the entire contract viewed in

light of the circumstances under which the contract was made." *Id.* at 747 (citing

*Crawford*, 66 S.E. at 47) (other citation omitted).  "[A] liquidated damages clause

is invalid only when the actual damages contemplated *at the time of the agreement*

are shown to be certain and not difficult to determine or the stipulated amount is

out of all proportion to the actual damages." *Boots, Inc. v. Singh*, 649 S.E.2d 695,

698 (Va. 2007) (citing *O'Brian v. Langley Sch.*, 507 S.E.2d 363, 365 (Va. 1998))

(other citations omitted).  "The party challenging the validity of a liquidated

damages clause has the burden of proof on the issue of whether the opposing

45

party's 'damages . . . are susceptible of definite measurement or . . . the stipulated damages are grossly in excess of the actual damages suffered by the non-breaching party.'" *Id.* at 697 (quoting *O'Brian*, 507 S.E.2d at 365) (alterations in original).

47.     Section 10(c) of the 2011 Franchise Agreement provides for liquidated damages equal to the greater of one hundred thirty percent (130%) of (1) the gross receipts received from the conduct in violation of Sections 10(a) and 10(b); and (2) the gross receipts Plaintiff lost as a result of the conduct in violation of Sections 10(a) and 10(b).

48.     Defendants failed to prove that the liquidated damages provision in Section 10(c) of the 2011 Franchise Agreement is unenforceable, and, therefore, the provision is enforceable.

49.     Plaintiff failed to prove either the amount of gross receipts Defendants received from their violation of Sections 10(a) and 10(b) of the 2011 Franchise Agreement or the gross receipts that Plaintiff lost as a result thereof.

50.     Plaintiff is entitled to nominal damages against Defendants in the amount of Ten and 00/100 Dollars ($10.00) for Defendants' violation of Section 10(a) and Section 10(b) of the 2011 Franchise Agreement. *See Crist*, 343 S.E.2d at 311.

51.     Section 10(c) of the 2014 Franchise Agreement provides for liquidated damages equal to two times the greater of (1) the total gross receipts

46

during the last fiscal year (May 1 through April 30) for the franchise in breach; and

(2) the total revenue received from the conduct in violation of Sections 10(a) and

10(b).

52.     Defendants failed to prove that the liquidated damages provision in

Section 10(c) of the 2014 Franchise Agreement is unenforceable, and, therefore,

the provision is enforceable.

53.     Defendants' gross receipts for the fiscal year from May 1, 2018

through April 30, 2019, the final fiscal year in which the Lahaina Franchise was in

operation, was $33,282.40.  Ex. P-11 (2014–18 Gross Receipts Report) at

LIBTAX000046.

54.     Plaintiff is entitled to liquidated damages against Defendants of

$66,564.80 for Defendants' violation of Sections 10(a) and 10(b) of the 2014

Franchise Agreement pursuant to Section 10(c).

55.     "'The general rule is that exemplary or punitive damages are not

allowed for breach of contract[.]  This rule does not obtain, however in those

exceptional cases where the breach amounts to an independent, willful tort since

the plaintiff has a right to elect whether he will proceed in tort or upon the

contract.'" *Kamlar Corp. v. Haley*, 299 S.E.2d 514, 518 (Va. 1983) (quoting

*Goodstein v. Weinberg*, 245 S.E.2d 140, 143 (Va. 1978)).

56.     Plaintiff has not proven that that Defendants' violations of Sections 10(a) and 10(b) of the 2011 Franchise Agreement and the 2014 Franchise Agreement constitute independent, willful torts, and, in, any event, Plaintiff has chosen to sue Defendants for breach of contract rather than in tort for the foregoing violations.

57.     Plaintiff is not entitled to an award of punitive damages against Defendants for Defendants' violations of Sections 10(a) and 10(b) of the 2011 Franchise Agreement and the 2014 Franchise Agreement.

58.     Plaintiff is entitled to judgment on Count V of the Complaint and an award of damages of against Defendants Six Thousand Five Hundred Seventy-Four and 80/100 Dollars ($66,574.80).

## VI.    COUNT VI:  FEDERAL TRADEMARK INFRINGEMENT

59.     The elements of a federal trademark infringement claim under 15 U.S.C. § 1114(1) are that (1) the plaintiff "has a valid, protectable mark"; and (2) "the defendant's use of the mark is likely to cause consumer confusion." *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018) (citing *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007)).

60.     Plaintiff failed to prove the existence of any particular valid, protectable mark.

48

61.     Plaintiff failed to prove that Defendants' use of any of Plaintiff's Marks was likely to cause consumer confusion.

62.     Defendants are entitled to judgment on Count VI of the Complaint.

## VII.  COUNT VII:  FALSE DESIGNATION AND MISREPRESENTATION OF ORIGIN

63.     The elements of a false designation and misrepresentation of origin in violation of 15 U.S.C. § 1125(a) are that "a person must (1) use in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007) (citing 15 U.S.C. § 1125(a)).

64.     Plaintiff has not proven that Defendants used in commerce any false word, false designation of origin, false or misleading description, or representation fact that is likely to cause confusion.

65.     Plaintiff has not proven that Defendants used in commerce any false word, false designation of origin, false or misleading description, or representation fact that misrepresented the characteristics of their or another person's goods or services.

66.     Defendants are entitled to judgment on Count VII of the Complaint.

## VIII.  COUNT VIII:  FEDERAL TRADEMARK DILUTION

67.     The elements of a trademark dilution claim under 15 U.S.C. § 1125(c) are "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008) (footnote and citations omitted).

68.     Plaintiff failed to establish the existence of any particular famous and distinctive mark.

69.     Defendants used Plaintiff's Marks in commerce, but Plaintiff failed to prove the existence of any famous mark.

70.     Plaintiff failed to prove that Defendants' use of any of Plaintiff's Marks were likely to cause dilution by blurring or dilution by tarnishment.

71.     Defendants are entitled to judgment on Count VIII of the Complaint.


## IX.    COUNT IX:  DEFEND TRADE SECRETS ACT

72.     The elements of a claim for misappropriation of a trade secret under 18 U.S.C. § 1836 are (1) the existence of a trade secret; and (2) the misappropriation of that trade secret.  *See Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020) (citation omitted).

73.     The term "trade secret" includes

50

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if —

> **(A)** the owner thereof has taken reasonable measures to keep such information secret; and

> **(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

74.     There are "three definitions of 'misappropriation':  (1) the 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;' (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent."  *Attia*, 983 F.3d at 424 (citations omitted).

75.     Plaintiff failed to prove the existence of any particular trade secret.

76.     Having failed to prove the existence of a particular trade secret, Plaintiff failed to prove that Defendants misappropriated a trade secret.

77.     Defendants are entitled to judgment on Count IX of the Complaint.

**X.     COUNT X:  UNJUST ENRICHMENT/RESTITUTION**

78.     The elements of an unjust enrichment claim are that (1) the defendant

conferred a benefit upon the plaintiff; and (2) the retention of that benefit by the

defendant would be unjust.  *See Durette v. Aloha Plastic Recycling, Inc.*, 105

Hawai'i 490, 504, 100 P.3d 60, 74 (2004) (citing *Small v. Badenhop*, 67 Haw. 626,

635–36, 701 P.2d 647, 654 (1985)).

79.     Equitable remedies, which includes claims for unjust enrichment, "are

not available when an express contract exists between the parties concerning the

same subject matter. . . .  Where the parties to a contract have bargained for a

particular set of rights and obligations, all claims involving those express rights

and obligations properly lie in contract law and not in equity."  *Sung v. Hamilton*,

710 F. Supp. 2d 1036, 1064 (D. Haw. 2010) (citations omitted).

80.     The franchisor-franchisee relationship between Plaintiff and

Defendants is governed by the 2011 Franchise Agreement and the 2014 Franchise

Agreement, as each are amended by the Assignment and Amendment to Franchise

Agreements.

81.     Plaintiff may not recover against Defendants on an unjust enrichment

theory because there are two express contracts between Plaintiff and Defendants

concerning the subject matter of Plaintiff's unjust enrichment claim.

82.     Defendants are entitled to judgment on Count X of the Complaint.

## XI.    COUNT XI:  REQUEST FOR PRELIMINARY INJUNCTION

83.     Plaintiff's request for a preliminary injunction is moot because this case has already proceeded to trial on the merits.

84.     Defendants are entitled to judgment on Count XI of the Complaint.

## XII.   COUNT XII:  REQUEST FOR PERMANENT INJUNCTION

85.     Plaintiff's request that any preliminary injunction be converted into a permanent injunction is moot as the Court has not issued a preliminary injunction in this case.

86.     Plaintiff has not proven that it is entitled to a permanent injunction as a remedy for any of the claims in the Complaint.

87.     Defendants are entitled to judgment on Count XII of the Complaint.

In accordance with the above findings of fact and conclusions of law, the Court hereby ORDERS that judgment be entered in favor of Plaintiff with respect to Counts II, III, and V, and in favor of Defendants with respect to Counts I, IV, VI, VII, VIII, IX, X, XI, and XII.  The Court further ORDERS that judgment enter in favor of Plaintiff and against Defendants in the amount of Two Hundred Sixty-Seven Thousand Two Hundred Fifty-Eight and 96/100 Dollars ($267,258.96), and in favor of Plaintiff and against Owen and Norma in the amount of Sixty-Seven Thousand Two Hundred Eighty-Eight and 11/100 Dollars ($67,288.11).  The parties may apply to the Court by separate motion for a determination of prevailing party status and entitlement to attorneys' fees and costs.

IT IS SO ORDERED.

DATED:     Honolulu, Hawaiʻi, September 24, 2021.



Jill A. Otake
United States District Judge